**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **SHAMAR SCALES,**           ) | |
|          ) | |
|          **Petitioner,**   ) | |
|          ) | |
| **vs.**          ) | **Case No. 20-cv-78-DWD** |
|          ) | |
| **CHERRYLE HINTHORNE,**   ) | |
|          ) | |
|          **Respondent.**   ) | |

**MEMORANDUM AND ORDER**

**DUGAN, District Judge:**

      Petitioner Shamar Scales was convicted of one count of criminal sexual assault in Jackson County, Illinois (Doc. 12-1). He is serving a 13-year sentence in the Illinois Department of Corrections. Petitioner's sentence was affirmed on direct appeal. *People v. Scales*, 2018 IL App (5th) 140329-U at ¶ 40. On January 31, 2019, his petition for leave to appeal was denied by the Illinois Supreme Court. *People v. Scales*, 116 N.E.3d 926 (Ill. 2019) (Table).

      Now before the Court is Petitioner's petition for habeas corpus brought pursuant to 28 U.S.C. § 2254. Petitioner asserts that his right to a fair trial was violated by: (1) The State's reliance on testimony that was internally inconsistent and which violated the "laws of nature and logic"; (2) The State's failure to prove all of the elements of the crime beyond a reasonable doubt, including failing to prove any elements of force or criminal intent; and (3) The trial judge's bias against him as shown in the judge's statements at sentencing (Doc. 1). Respondent opposes issuance of a writ (Doc. 11; Doc. 12).

## Procedural History and Relevant Facts

This summary of the facts is derived from the detailed descriptions by the Illinois Appellate Court, Fifth District, in its Rule 23 Order affirming Petitioner's conviction on direct appeal (Doc. 12-6); *People v. Scales*, 2018 IL App (5th) 140329-U.  These facts are presumed to be correct unless rebutted by clear and convincing evidence, which Petitioner has not shown.  28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012); *Simental v. Matrisciano*, 363 F.3d 607, 612 (7th Cir. 2004) (The Court may rely on the factual summary of the state appellate court without reviewing the transcripts of petitioner's trial, which is not required, and "is, in fact, quite rare."); *Mendiola v. Schomig*, 224 F.3d 589, 592–93 (7th Cir. 2000).

In November 2013, a jury convicted Petitioner of one count of criminal sexual assault in violation of 720 Ill. Comp. Stat. Ann. 5/11-1.20, which provides in relevant part, that "(a) A person commits criminal sexual assault if that person commits an act of sexual penetration and: … (2) knows that the victim is unable to understand the nature of the act or is unable to give knowing consent." (*See* Doc. 12-1; Doc. 12-2).  At Petitioner's trial, both he and the victim, S.M., testified about the events at issue and the nature of their relationship prior to the assault.  It was uncontested at trial that Petitioner committed an act of sexual penetration, thus the only issue in dispute concerned whether Petitioner knew that S.M. was asleep and unable to give consent.  *Scales*, 2018 IL App (5th) 140329-U at ¶ 3.

According to the victim, she, her brother, Petitioner, and Petitioner's sister were all close friends, having grown up together in Chicago.  The four of them later moved to

2

Carbondale to attend college.  When S.M. moved to Carbondale for college she shared an apartment with Petitioner's sister.  When Petitioner later moved to Carbondale, S.M. and Petitioner's sister often allowed Petitioner to stay with them at their apartment, although Petitioner did not live with them.  *Scales*, 2018 IL App (5th) 140329-U, at ¶ 4.  According to S.M., Petitioner typically slept on the sofa, but on rare occasions would fall asleep in either her or his sister's bed while watching a movie.  *Id.*

The events at issue occurred in April 2013.  At that time, S.M. shared an apartment with her brother and a male friend.  Petitioner lived with other friends.  S.M. testified that on April 11, her childhood friend came to Carbondale to spend the weekend celebrating his birthday.  The friend arrived at approximately 2:00 in the afternoon, when S.M. had just finished classes for the day and was getting ready to go to work.  S.M.'s job involved cleaning the engineering building.  S.M. testified that she drank five or six shots of tequila with her friend before going to work.  S.M. testified that she did not feel tipsy.  She then worked from approximately 4 or 5 p.m. until 8:30 or 9 p.m.  During her work break, at approximately 6 p.m., S.M. drank half a glass of champagne with her coworker.

After work, S.M. went to an apartment in University Village.  There she drank a bottle of wine.  Sometime after 10 p.m., S.M. and a group of friends went to a bar called Callahan's.  S.M. testified that she did not have anything more to drink at Callahan's.  S.M. stated that she was "tipsy" at first, but "sobered up as the evening went on because she had to 'take care of some people who were just really belligerent and drunk.'" *Id.* at ¶ 6.  These people included her friend who was visiting for his birthday, Petitioner, S.M.'s brother, and S.M.'s roommate.

3

S.M. estimated that she left Callahan's at approximately 1:45 in the morning. She stopped at the apartment where her friend was staying before walking back to her apartment. When she arrived at her apartment, S.M. saw her roommate, Petitioner, and another individual sitting inside a parked car. S.M. did not consider this to be unusual or alarming. S.M. went inside her apartment and found her brother home alone, passed out on the floor of his bedroom. S.M. attempted to get her brother into bed but was unable to do so. After that, S.M. ate some food, changed into her pajamas, turned on the television, and went to sleep. S.M. testified that she always closed the door to her bedroom when she slept and was certain that she did so that night. She estimated that she went to bed between 2:30 and 2:45 a.m.

S.M. testified that she was awakened by the sensation of a penis penetrating her vagina. She noted that her pajama bottoms were down around her knees, which is not where they were when she went to bed. S.M. testified initially that she thought she was dreaming. The person having intercourse with her was behind her, under the covers. S.M. testified that she pretended to be asleep, but turned over to face the individual, opened her eyes, and saw that it was Petitioner. S.M. then moved away from him, got out of bed, and angrily told Petitioner to get out. Petitioner left as she told him to do. According to S.M., before leaving, Petitioner said "Man, you tweakin'. You know what you did." He also told her, "I don't know what you talking about." *Id.* at ¶ 9. S.M. emphasized that Petitioner did not wake her up to ask if she wanted to have sex, and she never told him that it was okay. *Id.* at ¶ 8.

4

On cross-examination, S.M. was asked about how long the intercourse lasted.  She replied, "I would say about one to two minutes."  Asked how she knew this, she replied, "Cause it was not long. I remember reacting fast." She acknowledged, however, that she did not know exactly how long it went on before she woke up and realized she was not dreaming.  S.M. was also asked whether she was sober when she left Callahan's.  She explained that she did not feel impaired in any way.  She further stated, "I wouldn't say I was sober 'cause many people feel sober when they take a sobriety test and they are over."  She went on to note, however, that she thought she was sober by the time she went to bed.

Petitioner also testified at trial.  "Much of [his] testimony about the sequence of events leading up to the intercourse was similar to S.M.'s account."  *Id.* at ¶ 12.  He testified that he moved to Carbondale in 2009 to attend college.  At the time of trial, in November 2013, he was still a freshman at a community college.  He testified that he lived with his sister and S.M. during his first two years in Carbondale, but in April 2013 he was living with friends.

Petitioner testified that before going to Callahan's on the night of April 11, 2013, he drank shots with S.M., S.M.'s friend visiting for his birthday, and some other people.  He testified that neither he nor S.M. had a lot to drink.  Petitioner noted that he had one or two shots and thought S.M. did not have "that many."  Petitioner testified that their group arrived at Callahan's around 11:30 p.m., and they left when the bar closed at 2 a.m.  He testified that when the bar closed, they could not find S.M.'s brother, so he got into a car with S.M.'s roommate and another individual to look for him.  S.M. left Callahan's

with other friends.  After looking for S.M.'s brother in a few places, they decided to go to the apartment S.M. and her brother shared.  Petitioner estimated they arrived at the apartment at 2:45 a.m. and found S.M.'s brother passed out on the bathroom floor.  Petitioner and S.M.'s roommate carried S.M.'s brother to his bed.  Petitioner then went into S.M.'s bedroom to sleep in her bed with her.  Petitioner explained that he shared a bed with S.M. frequently and "it wasn't a problem." *Id.* at ¶ 14.  Petitioner testified that he and S.M. had never previously had a sexual relationship.  *Id.*

Here, Petitioner's account of events diverges from S.M.'s version.  According to Petitioner, when he got into bed with S.M., S.M. turned around and looked at him. Petitioner said he could see that S.M.'s eyes were open, and she was awake.  Petitioner acknowledged that there was no conversation about sex.  He testified, however, that S.M. "allowed" him to pull down her pajama bottoms, digitally stimulate her, and have sex with her.  Petitioner explained that he was unable to pull her pajama bottoms all the way down until she rolled over because her hip was in the way.  He further testified that during sex, S.M. moved with him and moaned.  Petitioner testified that the intercourse lasted 10 to 15 minutes, during which time S.M. gave no indication that she did not want to have sex with him.

Petitioner testified that when he was about to ejaculate, S.M. pulled away from him and told him to get out.  As a result, he testified that he ejaculated into his hand.  He asked S.M. "What are you talking about?"  He explained that he was confused, and then testified that he got his clothes and left.  *Id.* at ¶ 16.  During cross-examination, Petitioner admitted that when he went into S.M.'s room, the lights were out, and she was under the

6

covers. *Id.* at ¶ 17.  He also testified that before he left, S.M. said to him, "I won't tell anyone what we did." *Id.*

S.M. was called to testify in rebuttal.  She testified that she did not open her eyes and look at Petitioner before the sex, she did not help him remove her pajama bottoms, and she did not tell Petitioner that she would not tell anyone that they had sex.  When asked if Petitioner had sex with her for 10 to 15 minutes, S.M. replied, "I have no idea." She then added, "It could have been 15 minutes. I was very moist."  She reiterated, however, that she did not know how long the sex lasted.  She testified that she did not know whether Petitioner ejaculated into his hands.  She further testified that she did not wake up when Petitioner pulled down her pajama bottoms.  She also stated that she did not have a sleep disorder when asked by defense counsel. *Id.* at ¶ 18.

At least two other individuals testified at trial: the nurse who was present during S.M.'s sexual assault examination and the forensic scientist who tested S.M.'s sexual assault evidence kit. *Id.* at ¶ 41.  The nurse testified that there was no injury to S.M.  The forensic scientist testified that S.M.'s vaginal swab contained a large amount of female DNA and a small quantity of male DNA.  The forensic scientist further testified that she did not see sperm cells when she looked at the swab under a microscope, thus concluding that there was a small amount of semen present without the presence of sperm cells.

The jury returned a guilty verdict, and the court ordered a presentence investigation report ("PSI"). *Id.* at ¶ 19.  The PSI indicated that Petitioner refused to sign a release form so the probation officer could obtain information from the college he was attending. *Id.*  An addendum to the PSI was filed in March 2014, adding a written victim

impact statement from S.M. *Id.* at ¶ 20.  In relevant part, the victim statement indicated that S.M. felt betrayed, embarrassed, and alienated by her status as a "victim."  *Id.*  She also described the loss of her friendship with Petitioner's sister who had previously been one of her closest friends.  *Id.*

Petitioner was sentenced in May 2014.  At sentencing, Petitioner gave a statement in allocution where he argued that he was innocent and insisted that S.M. consented to sex through her actions.  *Id.* at ¶¶ 21-22.  As Petitioner began to ask, "What female in her right mind [that] do not have a sleeping disorder—" *Id.* at ¶ 22, the sentencing judge interrupted him and asked Petitioner, "So this is all her problem?"  Petitioner replied, "No, both of us have accountability in this."  The judge reminded Petitioner that 12 jurors who heard the evidence found that the sex was not consensual.  The judge then said, "Now, if you don't want to accept that, that's fine, but don't go blaming the victim."  *Id.* at ¶ 22.  Petitioner concluded his statement by asking the court, "Could you please just have mercy on my soul, sir? My life is in your hands and my almighty savior, sir."  The judge responded, "Your life is in your own hands, and until you realize what you did, how you did, and why you did it, you are going nowhere but to hell, young man. You have not accepted one bit of responsibility for this."  *Id.* at ¶ 23.

The State recommended that Petitioner be sentenced to the statutory maximum of 15 years.  *Id.* at ¶ 24.  The prosecutor focused on the impact of the sexual assault on S.M., the need to deter others, and the need to protect the public from Petitioner.  The prosecutor emphasized Petitioner's lack of remorse and his refusal to cooperate with the probation officer who prepared his PSI.  *Id.*  Defense counsel asked for the statutory

minimum of four years, arguing that Defendant did not contemplate that his conduct would cause harm, and that he had no prior convictions, was unlikely to reoffend, and "expressed his displeasure with being incarcerated." *Id.* at ¶ 25. The court sentenced Petitioner to 13 years in prison without making express findings concerning factors in aggravation and mitigation. *Id.* at ¶ 26.

On direct appeal, Petitioner argued that: (1) the evidence was insufficient to convict because S.M.'s testimony was "inherently implausible"; (2) the evidence was insufficient to prove that petitioner acted with the requisite criminal intent because he believed that S.M. was awake and consented; and (3) the trial court imposed an excessive sentence (Doc. 12-3). The Appellate Court affirmed. *Scales*, 2018 IL App (5th) 140329-U, at ¶ 2. Petitioner filed a petition for leave to appeal raising the same three claims (Doc. 12-7, p. 6). The Illinois Supreme Court denied the petition for leave to appeal in January 2019 (Doc. 12-8). Petitioner did not file a petition for writ of certiorari (Doc. 1, p. 5).

## Legal Standard

This habeas petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act, known as the AEDPA. The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685 (2002). Habeas is *not* another round of appellate review. Instead, 28 U.S.C. § 2254(d) restricts habeas relief to cases where the state court determination resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of

the United States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." "A state court decision is 'contrary to' federal law when it 'contradicts the governing law set forth in Supreme Court cases." *Coleman*, 690 F.3d at 814 (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). "A state court decision involves an 'unreasonable application of … clearly established federal law' when the state court 'identifies the correct governing legal standard from Supreme Court cases but unreasonably applies it to the facts of the particular state prisoner's case.'" *Id.*

The scope of federal review of state court decisions on habeas is "strictly limited" by 28 U.S.C. § 2254(d)(1). *Jackson v. Frank*, 348 F.3d 658, 661 (7th Cir. 2003). The unreasonable application standard is "a difficult standard to meet." *Id.* at 662. Even an incorrect or erroneous application of the federal precedent will not justify habeas relief; rather, the state court application must be "something like lying well outside the boundaries of permissible differences of opinion." *Id.* (internal citation omitted); *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

### Timeliness, Exhaustion, and Procedural Default

As outlined above, Petitioner raises three grounds for relief in support of his Petition: (1) that the State relied on testimony that was internally inconsistent and which

violated the "laws of nature and logic"; (2) that the State failed to prove all of the elements of the crime beyond a reasonable doubt, including failing to prove any elements of force or criminal intent; and (3) that the trial judge was biased against him at sentencing (Doc. 1). Respondent concedes that grounds 1-2 of the Petition were timely filed and that Petitioner has exhausted state remedies. However, Respondent argues that Petitioner's ground 3, alleging an excessive sentence, is procedurally defaulted and further not cognizable on federal habeas review because it alleges a violation of state law (Doc. 11, p. 8). The Court will address ground 3 below, but first evaluates Petitioner's sufficiency of the evidence claims.

### Grounds 1 and 2: Sufficiency of the Evidence Claims

Petitioner argues that the State failed to prove the elements of his crime. First, Petitioner argues that the victim's testimony was inherently implausible and defied the laws of nature because, in his view, it was impossible for the victim to have remained asleep while he removed her pajama bottoms and had sex with her for 10 to 15 minutes. He thus argues that S.M.'s testimony was wholly incredible, and no reasonable jury could have believed it. Second, Petitioner argues that there was insufficient evidence of his criminal intent. Related here, Petitioner also wrongly argues that there was insufficient evidence of force, even though, as the appellate court confirmed, violence or force was not a part of his charge. *See Scales*, 2018 IL App (5th) 140329-U at ¶ 40 ("Here, the sole allegation against the defendant is that he engaged in sexual intercourse with S.M. when he knew she was unable to give knowing consent because she was asleep"). Thus,

Petitioner's arguments concerning violence or force are not applicable here, and the Court will not address them.

The state appellate court rejected Petitioner's claims on the merits.   As to Petitioner's implausibility/laws of nature defense, the appellate court reasoned:

> [W]e do not find S.M.'s testimony to be inherently implausible even assuming the sex lasted a full 15 minutes and she was completely sober by that time. The undisputed evidence showed that she went to bed very late, sometime after 2:30 a.m., after a long day. She went to classes, worked a physically demanding job for four or five hours, and went out dancing and celebrating with friends for several more hours. In addition, as we have just discussed, she testified that she drank a lot of alcohol, regardless of the extent to which she sobered up due to the passage of time. It is hardly surprising that she would sleep quite soundly under these circumstances.

*Scales*, 2018 IL App (5th) 140329-U at ¶ 45.  The appellate court also emphasized S.M.'s testimony that she thought she was dreaming when she first became aware of what was happening.  *Id.* at ¶ 46.  The appellate court reasoned that it was "not inherently implausible to believe that a person might incorporate a physical sensation into a dream and, as a result, might remain in a state between sleep and wakefulness rather than waking up immediately." *Id.*

The appellate court also rejected Petitioner's argument that there was insufficient evidence of his criminal intent.  *Id.* at ¶ 50.  Instead, the court found there was sufficient evidence to prove beyond a reasonable doubt that Petitioner knew S.M. was asleep and thus unable to give knowing consent to sex.  *Id.* The appellate court did acknowledge that there was some evidence in the record which supported Petitioner's argument that he reasonably believed S.M. was awake *Id.* at ¶ 49.  Here, the appellate court credited Petitioner's testimony that S.M. moaned during sex, S.M.'s testimony that her body

produced fluid and thought she was dreaming, and both parties' testimony that the sex stopped once S.M. objected.  *Id.* at ¶ 49.  However, the appellate court also found that there was sufficient evidence "to support the conclusion that the defendant was well aware that S.M. was sleeping."  *Id.* at ¶ 50.  Here, the appellate court pointed to Petitioner's admissions that when he entered the room, the lights were out and S.M. was under the covers, the parties never discussed having sex, and both parties testified that their relationship prior to that time had been "entirely platonic." *Id.*

The appellate court's rejection of Petitioner's sufficiency of the evidence claims was not contrary to, and did not involve an unreasonable application of, clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1); *see Coleman v. Johnson*, 566 U.S. 650, 651 (2012).  Nor was the decision based on an unreasonable determination of the facts in light of the evidence presented.  *Id.*  Under clearly established law, the prosecution must prove the elements of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). These elements are defined by state law.  *Coleman*, 566 U.S. at 654–55; *Bates v. McCaughtry*, 934 F.2d 99, 102–03 (7th Cir. 1991). Evidence is sufficient if, construing the evidence in light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

Under Illinois law, a person commits criminal sexual assault when he "commits an act of sexual penetration and . . . knows that the victim is unable to give knowing consent." 720 Ill. Comp. Stat. Ann. 5/11-1.20. Petitioner does not dispute that he committed an act of sexual penetration. *See Scales*, 2018 IL App (5th) 140329-U at ¶¶ 3, 15.

13

Rather, he asserts that the evidence was insufficient to establish that S.M. was unable to give consent because she was asleep, and Petitioner was aware that she was sleeping. However, applying the governing *Jackson* standard, the appellate court reasonably held otherwise. Petitioner's jury credited S.M.'s testimony, and the appellate court concluded that this was rational. *See Scales*, 2018 IL App (5th) 140329-U at ¶¶ 40, 45- 50.

This Court presumes a state court's credibility determinations are correct unless petitioner can rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Murrell v. Frank*, 332 F.3d 1102, 1112 (7th Cir. 2003); *Saxon v. Lashbrook*, 873 F.3d 982, 987–88 (7th Cir. 2017) (sufficiency claims on habeas review "are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable."). As the appellate court explained in rejecting petitioner's arguments, S.M.'s testimony that she was sleeping at the time of the attack was plausible. Due to S.M.'s exhaustion from a long day of school, work, and socializing, she could have slept through the sexual contact or attributed it to a dream. *Scales*, 2018 IL App (5th) 140329-U at ¶¶ 45-47. Although S.M. claimed to have been sober during the assault, she also testified that she consumed a significant quantity of alcohol, which added to her exhaustion. *Id.* Thus, the appellate court reasonably applied *Jackson* by holding that a rational juror could credit S.M.'s testimony that she was sleeping.

As the state court further reasonably concluded, a rational factfinder could also conclude that Petitioner knew that S.M. was unable to consent. *Scales*, 2018 IL App (5th)

140329-U at ¶¶ 47, 50. Petitioner admitted that the lights were off when he entered the room, that S.M. was under the covers, and that he did not discuss having sex. *Id.* at ¶ 50. Further, Petitioner testified that his relationship with the victim was entirely platonic. *Id.* Petitioner also testified that he was aware that S.M. had been drinking. *Id.* at ¶ 13.  At the very least, the state appellate court reasonably held that a rational juror could find that Petitioner knew the victim was sleeping and therefore unable to knowingly consent to sex. Thus, Petitioner is not entitled to habeas relief on his sufficiency claim.

Nevertheless, in an attempt to further bolster this claim in his reply brief, Petitioner raises, for the first time, two haphazard arguments concerning ineffective assistance of counsel and the State's alleged failure to disclose evidence (*See* Doc. 26, pp. 11-12). Specifically, Petitioner argues that his due process rights were violated because (1) the State failed to disclose evidence from a police incident allegedly showing that the victim had suffered a prior sexual assault, and (2) that his trial counsel failed to seek out an expert witness, such as a sleep specialist or mental health expert, who could speak to the victim's mental state.  Petitioner did not raise these arguments in his habeas corpus petition (Doc. 1) or on post-conviction appeal (Doc. 12-3; Doc. 12-7).

 It is a well-settled principle that litigants forfeit arguments raised for the first time in a reply brief. *See Stechauner v. Smith*, 852 F.3d 708, 721 (7th Cir. 2017) ("Arguments waived for the first time in a reply brief are waived) (citing *Darif v. Holder*, 739 F.3d 329, 336 (7th Cir. 2014)); *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (district courts are "entitled to find that an argument raised for the first time in a reply brief is forfeited."); *United States v. Stevens*, 380 F.3d 1021, 1025 (7th Cir. 2004) (describing a challenge brought

for the first time in a reply brief as "too late"). A party's main argument must appear in the opening brief so that the opposing party has a fair opportunity to adequately respond. A litigant may not reserve his argument for reply.  Petitioner's attempt to bifurcate his arguments between the petition and the reply prejudiced the State, as it was not put on notice regarding the extent of his arguments, and it did not have a fair chance to respond. Thus, the Court considers these new and underdeveloped arguments raised for the first time in his reply brief forfeited and declines to analyze them.

### Ground 3: Excessive Sentence Claim

Petitioner argues that his 13-year sentence was excessive because his sentencing judge was biased against him and failed to consider certain mitigating factors. Respondent, however, contends that Petitioner has procedurally defaulted this claim, or otherwise failed to bring a cognizable claim for federal heaves review because he only argued on appeal that his sentence was excessive under state law (Doc. 11, p. 8).

A habeas petitioner must clear two procedural hurdles before the Court may reach the merits of his habeas corpus petition: exhaustion of remedies and procedural default. *Rodriguez v. Peters*, 63 F.3d 546, 555 (7th Cir. 1995). Before seeking habeas relief, a petitioner is required to bring his claims through "one complete round of the State's established appellate review process" because "the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), *see also* 28 U.S.C. § 2254(c). Under the Illinois two-tiered appeals process, a habeas petitioner must fully present his claims not only to an intermediate appellate

court, but also to the Illinois Supreme Court, which offers discretionary review in cases such as this one. *Id.* at 843-846.

To the extent Petitioner asserts a state-law excessive sentence claim, Respondent argues that this claim provides no basis for federal habeas relief.  Indeed, to obtain a writ of habeas corpus, a state prisoner must establish that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); see also *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002) ("Federal habeas relief is only available to a person in custody in violation of the United States Constitution or laws or treaties of the United States, and is unavailable to remedy errors of state law.").  Federal habeas relief "is not available to correct perceived errors of state law." *Crockett v. Butler*, 807 F.3d 160, 168 (7th Cir. 2015); *Dellinger*, 301 F.3d at 764 ("[A]n error in the interpretation of [an] Illinois … statute, or the application of state sentencing rules, does not present a cognizable claim for federal habeas relief."); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").  Petitioner's argument that the trial court failed to properly weigh mitigating and aggravating factors, arises purely out of state law, and does not invoke a federal issue for federal habeas corpus relief.  *See, e.g., Gines v. Sullivan*, No. 16-CV-412-NJR, 2019 WL 1516464, at *4 (S.D. Ill. Apr. 8, 2019) ("Claims of error in the application of state sentencing laws are not cognizable on habeas review."); *Beachem v. Williams*, 351 F. Supp. 2d 793, 809 (N.D. Ill. 2004) (excessive sentence claim alleging failure to consider mitigating factors presented state law issue and was not appropriate for

federal habeas review). Thus, Petitioner's state-law excessive sentence claim is not cognizable and will be denied.

However, to the extent Petitioner asserts a federal constitutional claim concerning his sentence, Respondent argues that Petitioner failed to fairly present this claim in state court. Respondent contends that in state court Petitioner relied exclusively on state law in asserting his excessive sentence claim and cited no provisions of the federal constitution or case law in his briefs, and none of the cited cases applied a federal constitutional analysis. *See* Doc. 12-3, pp. 21-25; Doc. 12-5, pp. 8-12; Doc. 12-7, pp. 22-25. Thus, Respondent maintains that Petitioner failed to fairly present his federal claim in state court (Doc. 12) (citing *Wilson v. Briley*, 243 F.3d 325, 328 (7th Cir. 2001) (prisoner failed to fairly present federal claim in state court when his state court briefs did not cite federal cases and none of the state cases relied upon employed federal constitutional analysis)).

The Court agrees. State courts can be alerted to federal constitutional issues when: a petitioner (1) relies on federal cases that engage in constitutional analysis, (2) relies on state cases that apply constitutional analysis to similar facts, (3) frames the claims in terms so particular as to call to mind a specific constitutional right, or (4) the petition alleges a pattern of facts within the mainstream of constitutional litigation. *See McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013); *in accord Wilson*, 243 F.3d at 328 ("[A]buse-of-discretion arguments are ubiquitous, and most often they have little or nothing to do with constitutional safeguards."). Here, however, Petitioner's claim was based solely on state law principles.

In reviewing Petitioner's state court briefing, Petitioner relied exclusively on state law in asserting his excessive sentence claim. While Petitioner cited one federal case, and included one state case referencing another federal case, neither of these cases applied a federal constitutional analysis for an excessive sentence claim. *See Walker v. Martel*, 709 F.3d 925 (9th Cir. 2013) (federal habeas petition raising an ineffective assistance of counsel claim based on petitioner being subjected to a knee restraint during trial); *People v. Speed*, 129 Ill. App. 3d 348 (1984) (citing *Poteet v. Fauver*, 517 F.2d 393 (3d Cir. 1975) for the suggestion that a sentence may be improper if the sentencing court indicates that the sentence would be better if defendant abandons his claim of innocence)).  Thus, in reviewing these cases and Petitioner's arguments, the Court cannot conclude that Petitioner intended to present, let alone fairly presented, a federal constitutional claim to the state court.  Instead, in his briefing Petitioner relied on the only cited federal case to reference two quotes contained in the concurring opinion, stating: "Mr. Scales requests you to enter a new sentence more proportional to the gravity of the crime at issue, mindful of Abraham Lincoln's admonition: "mercy bears richer fruits than strict justice," and John Milton's, "[m]ercy [must] colleague with justice." (Doc. 12-3, p. 26) (citing *Walker*, 709 F.3d at 951–52 (Gould, J., concurring)).

Accordingly, Petitioner did not fairly present his federal due process claim in state court and it is procedurally defaulted.  Procedural default can be overcome, however, by a showing of cause and prejudice. To overcome this default, Petitioner must establish cause for his default and prejudice, or he must demonstrate that a failure to consider the claim would likely result in a miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722

(1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012).  To show that a miscarriage of justice is likely to result, Petitioner must meet the demanding *Schlup* standard for actual innocence, which he has not done.  *See McQuiggin v. Perkins*, 569 U.S. 383 (2013); *Schlup v. Delo*, 513 U.S. 298 (1995). In order to establish actual innocence under *Schlup*, a habeas petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," *Schlup*, 513 U.S. at 324, and in light of this new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537 (2006); *see also McQuiggin*, 569 U.S. at 399.

Petitioner has not presented any new reliable evidence.  In his briefing, Petitioner alludes to three pieces of evidence which were not presented at trial.  In his Petition, he briefly, and rather arbitrarily, argues that his trial counsel did not present evidence that the victim had suffered a prior sexual assault at trial (Doc. 1, p. 3).  He further complains that the State did not call his sister to testify although she had been subpoenaed (Doc. 1, p. 3).  Finally, for the first time in his reply, Petitioner argues that his trial counsel should have secured the testimony of an expert witness who could have confirmed Petitioner's theory of the case that it was "implausible" and "against nature" that the victim could have remained asleep when Petitioner pulled her pants down and had sex with her (Doc. 26, pp. 11-12).

The Court turns first to the "new evidence" alleged in his Petition, namely the evidence of the victim's prior sexual assault, and the testimony of Petitioner's sister.

Petitioner does not allege that these pieces of evidence were new.  Instead, he seemingly confirms that he knew this evidence existed before trial, and merely disputes that it was not used.  Nevertheless, Petitioner fails to demonstrate how this evidence, assuming it would have been admissible or relevant, would have impacted his case such that no reasonable juror would have found him guilty beyond a reasonable doubt.  Nor does Petitioner postulate what testimony his sister would have provided that would have differed from the testimony presented at trial.

Turning next to the arguments raised for the first time in his reply brief (Doc. 26, pp. 11-12), Petitioner argues that his trial counsel should have secured the testimony of an unidentified and speculative expert witness, such as a sleep specialist or mental health expert, who could have spoken to the victim's mental state and confirmed Petitioner's theory of the case that it was "implausible" and "against nature" that the victim remained asleep when Petitioner pulled down her pants and had sex with her (*Id.*). Petitioner did not, however, raise this argument in his habeas corpus petition (Doc. 1) or on direct appeal.  As mentioned above, it is a well-settled principle that litigants forfeit arguments raised for the first time in a reply brief.  *See Stechauner*, 852 F.3d at 721; *Narducci*, 572 F.3d at 324.  Thus, the Court need not consider this new argument, and declines to analyze it, except to mention that Petitioner also failed to provide any affidavits or opinions from a potential expert which he alleges should have been tendered at trial.  Moreover, assuming such an expert could be procured, Petitioner fails to argue how additional evidence of the victim's mental state would make his implausibility defense more persuasive in light of the Appellate Court's findings that, even absent a

21

sleeping disorder, it was plausible to conclude that S.M. was sleeping at the time of the attack because of her exhaustion from a long day of school, work, and socializing. *See Scales*, 2018 IL App (5th) 140329-U at ¶¶ 45-47.

Therefore, Petitioner's "new evidence" is not new or reliable and does not support a claim of actual innocence sufficient to overcome his procedural default here. Thus, Petitioner is not entitled to habeas relief on his federal excessive sentence claim.

## Conclusion

For these reasons, Petitioner's Petition for habeas relief under 28 U.S.C. § 2254 (Doc. 1) is **DENIED**. This entire action is **DISMISSED with prejudice**. The Clerk of Court shall enter judgment accordingly.

## Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, this Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate should be issued only where the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a petition is dismissed on procedural grounds without reaching the underlying constitutional issue, Petitioner must show both that reasonable jurists would "find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

Here, Petitioner has not made a substantial showing of the denial of a constitutional right.  Nor would a reasonable jurist find it debatable whether this Court's rulings on procedural default or the substantive issues were correct. Accordingly, the Court **DECLINES** to issue a certificate of appealability.

**SO ORDERED.**

Dated:  February 10, 2023

_____
DAVID W. DUGAN
United States District Judge